45 F.3d 1423
 UNITED STATES of America, Plaintiff-Appellee,
v.
Steven ROBERTSON, a/k/a Steven Davis, a/k/a Whitey, a/k/a
Johnny Lee, a/k/a Mohammed, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Edward GRAVES, a/k/a Poncho, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Glenda WALKER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Carlos TORRES, Defendant-Appellant.
 Nos. 93-1292, 93-1294, 93-1300 and 93-1301.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 23, 1995.
Rehearing Denied March 6, 1995.
 
 John M. Hutchins, Asst. U.S. Atty. (Henry L. Solano and Craig F. Wallace, U.S. Attys., with him on the briefs), Denver, CO, for plaintiff-appellee.
 David C. Japha, Denver, CO, for plaintiff-appellant in No. 93-1292.
 Stephen M. Wheeler of Wheeler Law Offices, PC, Evergreen, CO, for plaintiff-appellant in No. 93-1294.
 Daniel C. Hale of Miller, Hale & Harrison, LLC, Boulder, CO, for plaintiff-appellant in No. 93-1300.
 Raymond P. Moore, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, and Jenine Jensen, Asst. Federal Public Defender, on the brief), Denver, CO, for plaintiff-appellant in No. 93-1301.
 Before BRORBY, Circuit Judge, LAY,* Senior Circuit Judge, and McWILLIAMS, Circuit Judge.
 BRORBY, Circuit Judge.
 
 
 1
 The defendants, Steven Robertson, Edward Graves, Glenda Walker, and Anthony Torres, bring these separate appeals alleging numerous errors concerning their convictions and sentences. Because these appeals arise out of a common criminal enterprise and many of the issues presented by the individual defendants relate to identical facts and rulings of the district court, we address them in a single opinion. We have jurisdiction under 28 U.S.C. Sec. 1291, and for the reasons set forth below, affirm in part, reverse in part, and remand in part.
 
 I. BACKGROUND
 
 2
 Steven Robertson, Glenda Walker, and Anthony Torres were initially charged with conspiracy to distribute more than fifty grams of cocaine base ("crack cocaine") and distribution of more than five grams of crack cocaine in violation of 21 U.S.C. Sec. 841(a)(1), (b)(1)(A)(iii) and (b)(1)(B)(iii), 21 U.S.C. Sec. 846, and 18 U.S.C. Sec. 2.[1] Subsequently, a superseding indictment was filed containing twenty additional counts. In addition to the original charges, Mr. Robertson was charged with possession with intent to distribute more than 500 grams of powder cocaine in violation of 21 U.S.C. Sec. 841(a)(1) and 21 U.S.C. Sec. 846. The remaining counts charged various defendants with money laundering in violation of 18 U.S.C. Sec. 1956(a)(1)(A)(i) and (B)(i). A second superseding indictment was filed charging Edward Graves with participation in the conspiracy. This indictment also added two counts against Ms. Walker for possession of firearms by a convicted felon. These two counts were severed prior to trial.
 
 
 3
 Shortly before trial, Messrs. Robertson, Graves and Torres sought to enter guilty pleas which they had entered into with the government. The district court refused to accept these agreements concluding none of the three defendants had complied with "local rules" concerning plea agreements and stating that no Rule 11(e)(1)(C) plea agreements would be accepted in the case. The court concluded: "If you want to plead to the indictment and take your chances, then that'll be something that I'll take a look at. Otherwise, this case is going to trial next Monday." Only Mr. Torres pled guilty to the indictment against him.[2]
 
 
 4
 Mr. Robertson was convicted by a jury of eight counts and acquitted of one.[3] Mr. Graves was convicted by a jury of the single count against him.[4] Ms. Walker, in a concurrent trial to the court, was convicted of three counts.[5]
 
 
 5
 The underlying facts are as follows.[6] The government presented numerous witnesses at trial who testified as to their extensive observations concerning the drug operation and the individual defendants' involvement in it. Most of them were admitted users of crack cocaine who gained their information as a result of purchasing drugs from, selling drugs for, and socializing with the defendants.
 
 
 6
 The testimony at trial indicated Mr. Robertson and Mr. Graves operated an extensive crack cocaine operation in the Metro-Denver area. Mr. Robertson was characterized as the "ring-leader" of the operation who procured drugs, handled the money, and gave orders concerning how the conspiracy would be run. Mr. Graves was portrayed as the "second in command" who worked closely with Mr. Robertson and primarily was responsible for distributing crack cocaine to various locations in Denver where the conspiracy operated and who also sold small quantities of crack cocaine directly to users. Mr. Torres, while a part of the conspiracy, appeared on the scene only intermittently.
 
 
 7
 Crack cocaine was distributed to and sold from a number of houses, apartments, and motel rooms. Ms. Walker, the common law wife or companion of Mr. Graves, was portrayed as a relatively minor player in the conspiracy who appeared frequently at the "sale" locations, the "safe houses" where drugs and money were kept, and occasionally sold small quantities of crack cocaine. In addition, she sometimes paid the rent for locations used in furtherance of the enterprise.
 
 
 8
 Dwight Sherman was a frequent user of crack cocaine. He bought it from, smoked it with, and sold it for Mr. Graves. Following his arrest for involvement in a crack cocaine sale, Mr. Sherman began cooperating with law enforcement. He informed Detective Demmel of the Denver Police Department that Mr. Graves would be receiving a package of cocaine in the mail at one of two locations in Denver. Based on this information, agents of the Drug Enforcement Administration intercepted the package and obtained a search warrant for it. The package contained approximately 872 grams of 88 percent pure cocaine. A controlled delivery of the package was made the following day. Bryan Kuykendall was arrested at the time of this controlled delivery.
 
 II. JURY WAIVER
 
 9
 Ms. Walker argues the district court erred in allowing the case against her to proceed as a non-jury trial. Ms. Walker's counsel filed a motion waiving her right to trial by jury. The motion, however, was not signed by Ms. Walker, although it did note her agreement to waive. Because the "waiver" of her right to trial by jury was invalid, Ms. Walker urges her conviction be vacated. We agree.[7]
 
 
 10
 We review the district court's findings of historical fact for clear error; however, the question of whether there has been a denial of the right to a jury trial is reviewed de novo. See Adams v. Peterson, 968 F.2d 835, 843 (9th Cir.1992) (en banc) ("ultimate question of voluntariness [to a stipulated-facts trial] is reviewed de novo"), cert. denied, --- U.S. ----, 113 S.Ct. 1818, 123 L.Ed.2d 448 (1993); cf. United States v. Burson, 952 F.2d 1196, 1199 (10th Cir.1991) (reviewing voluntariness of a waiver of the right to counsel de novo ), cert. denied, --- U.S. ----, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992); United States v. Williams, 919 F.2d 1451, 1455 (9th Cir.1990) ("Whether a [guilty] plea is voluntary is a question of federal law subject to de novo review"), cert. denied, 499 U.S. 968, 111 S.Ct. 1604, 113 L.Ed.2d 667 (1991).
 
 
 11
 A criminal defendant's right to a trial by jury is a fundamental right. Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447-48, 20 L.Ed.2d 491 (1968). This right may be waived, however, if: (1) the waiver is in writing; (2) the government consents; (3) the trial court accepts the waiver; and (4) the waiver is knowing, intelligent, and voluntary. F.R.Crim.P. 23(a); Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942); Patton v. United States, 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930).
 
 
 12
 Ms. Walker first argues her "waiver" was invalid because she never signed a written waiver as required by Rule 23(a). The requirement a defendant give her written consent to waive the right to trial by jury is intended to impress her with the significance of the right relinquished and provide evidence of her consent to forego that right. United States v. Martin, 704 F.2d 267, 271 (6th Cir.1983); 8A James W. Moore, Moore's Federal Practice p 23.03[b] (2d ed. 1994). Some circuit courts have adopted the view that noncompliance with Rule 23(a) does not ipso facto render a waiver invalid so long as there is an effective oral waiver of the right on the record.[8] E.g., United States v. Saadya, 750 F.2d 1419, 1420 (9th Cir.1985) (only exception to Rule 23(a)'s writing requirement "is where the record clearly reflects that the defendant 'personally gave express consent in open court, intelligently and knowingly.' " (Quoting United States v. Reyes, 603 F.2d 69 (9th Cir.1979)). In contrast, other circuits have concluded strict compliance with the requirements of Rule 23(a) is necessary to waive a jury trial. E.g., United States v. Garrett, 727 F.2d 1003, 1012 (5th Cir.1984), aff'd, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).
 
 
 13
 Mindful of Rule 23(a)'s writing requirement and the reasons for it, we conclude requiring strict compliance with Rule 23(a) is not justified. In those circumstances where the record clearly reflects a defendant's waiver of the right is voluntary, knowing, and intelligent, we see no practical justification for finding a waiver invalid simply because Rule 23(a)'s writing requirement has not been met. Cf. United States v. Prichard, 875 F.2d 789, 790 (10th Cir.1989) (per curiam) (holding that collateral review of the validity of a jury waiver in the absence of a Rule 23(a) writing is not available absent any indication the defendant was prejudiced by "the technical error"). The Constitution requires only that a waiver of the right to trial by jury be knowing, intelligent, and voluntary. Adams, 317 U.S. at 275, 63 S.Ct. at 240; Patton, 281 U.S. at 312, 50 S.Ct. at 263. When the purposes of Rule 23(a) have been satisfied by means other than a written waiver, little is served by rigidly requiring compliance with the Rule. See Brown v. Burns, 996 F.2d 219, 221 (9th Cir.1993) (per curiam). To conclude otherwise would, in our opinion, elevate form over substance. Accordingly, we hold while Rule 23(a) should be complied with in all cases, noncompliance will not necessarily invalidate a waiver of the right to trial by jury if the waiver can otherwise be shown to have been entered knowingly, voluntarily, and intelligently.
 
 
 14
 Second, Ms. Walker argues her waiver was invalid on the grounds nothing in the record indicates her decision to waive was knowing, voluntary, and intelligent. More specifically, she contends it was error for the district court to accept the waiver of her jury trial right without first inquiring as to whether she understood the nature of the right and consequences of waiving it. There appears to be unanimous agreement among those circuits that have addressed the issue that trial courts should inform defendants, on the record, of the nature of the right to trial by jury and the consequences of waiving that right before a waiver is accepted--the only dispute being whether such a dialogue should be mandated by a supervisory rule or strongly suggested to the district courts. Compare, e.g., United States v. Scott, 583 F.2d 362, 364 (7th Cir.1978) (adopting mandatory supervisory rule requiring district courts to interrogate defendants prior to accepting a jury trial waiver) with Cochran, 770 F.2d at 852 (9th Cir.1985) (emphasizing district courts should advise defendants on the record); Martin, 704 F.2d at 275 (expressing confidence district courts "will take a few moments and inform defendants of their jury trial right on the record "). See also 2 Charles A. Wright, Federal Practice & Procedure: Criminal 2d Sec. 372 (1982) ("It clearly is the better practice for the court to interrogate the defendant personally, before accepting a waiver of jury trial, to be sure that the defendant understands his right to trial by jury and the consequences of a waiver.").
 
 
 15
 Rule 23(a) should be complied with in each and every case. It is important to recognize, however, that even in those cases where the Rule is complied with, this is no guarantee the waiver comports with constitutional requirements. "The general rule is that a showing that the defendant's consent to waive his right to a jury trial was knowing, voluntary and intelligent is a necessary precondition to an effective Rule 23(a) jury trial waiver, one distinct from the requirement that the waiver be written." 8A Moore's Federal Practice p 23.03[c]. By informing a defendant of her right to a trial by jury, the nature of that right, and consequences of waiving it, district courts can insure such a waiver is valid. A court should not be satisfied of the validity of a waiver of this fundamental right simply because the requirements of Rule 23(a) have been met.
 
 
 16
 In recognition of the importance of a colloquy between the defendant and district court regarding the decision to waive the right to trial by jury, we join those circuits that, while declining to issue a mandatory supervisory rule, strongly urge district courts personally to inform each defendant of the nature of jury trials on the record before accepting a proffered waiver. See Cochran, 770 F.2d at 852-53; Martin, 704 F.2d at 274; United States v. Anderson, 704 F.2d 117, 118-19 (3rd Cir.), cert. denied, 464 U.S. 838, 104 S.Ct. 129, 78 L.Ed.2d 125 (1983); United States v. Strother, 578 F.2d 397, 404-05 (D.C.Cir.1978); United States v. Hunt, 413 F.2d 983, 984 (4th Cir.1969). Given the significance of the right to a jury trial and the importance of the decision to waive that right, we have no doubt district courts will insure such waivers are knowing, voluntary, and intelligent by informing defendants, on the record, of the nature of that right and the consequences of waiving it.
 
 
 17
 Defendants should be informed that (1) twelve members of the community compose a jury; (2) the defendant may take part in jury selections; (3) jury verdicts must be unanimous; and (4) the court alone decides guilt or innocence if the defendant waives a jury trial. See Cochran, 770 F.2d at 853; Martin, 704 F.2d at 274-75; United States v. Delgado, 635 F.2d 889, 890 (7th Cir.1981).
 
 
 18
 When district courts provide this information on the record, they help insure that defendants understand the basic mechanics of a jury trial before deciding whether to waive that right. By asking appropriate questions the district court will also be better able to perform its task of determining whether a proposed waiver is in fact being offered voluntarily, knowingly and intelligently. Finally, the record on appeal will be far more informative and helpful....
 
 
 19
 Cochran, 770 F.2d at 853.
 
 
 20
 Here, Ms. Walker did not sign the written waiver of her right to a jury trial submitted on her behalf. It was signed only by her attorney.[9] As explained above, this fact is not necessarily fatal to the validity of that waiver. Unlike those cases where an unsigned or unwritten waiver was held to be valid, however, there is nothing in the record before us indicating Ms. Walker personally understood her right and knowingly waived it.[10] On the contrary, the record only reveals Ms. Walker's attorney submitted a motion to waive a jury trial. The government apparently never consented to the waiver. In an unrelated motions hearing following the submission of Ms. Walker's motion, the district informed counsel he would be receiving the court's order granting the motion to waive. The district court never inquired as to the circumstances surrounding the waiver and no discussion was ever held in the presence of Ms. Walker regarding her decision to waive the right to trial by jury. Under these circumstances, there is no way for a reviewing court to determine whether Ms. Walker's waiver was knowing, voluntary, and intelligent. This fact, coupled with the strong presumption against finding a waiver of fundamental constitutional rights, see Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), compels us to reject the government's argument that her waiver is nevertheless valid. Accepting the government's argument would require us to permit the waiver of a fundamental constitutional right based on nothing more than conjecture and speculation. This we decline to do. The right of trial by jury is one enjoyed by the people as well as defendants and courts should be hesitant to dispense with that right.
 
 
 21
 Accordingly, we hold Ms. Walker's conviction must be vacated as there is no evidence in the record to indicate the waiver of her right to trial by jury was knowing, intelligent, and voluntary at the time it was accepted by the district court. We remand to the district court with instructions to allow Ms. Walker a trial by jury.
 
 III. PLEA AGREEMENT
 
 22
 Mr. Robertson argues his conviction must be reversed because the district court abused its discretion in rejecting a plea agreement reached between the government and himself. Mr. Torres argues his unconditional guilty plea must be set aside on the same grounds.
 
 
 23
 Approximately three months after the second superceding indictment was filed, the government entered into plea agreements with Mr. Robertson and Mr. Torres. On Friday, May 7--ten days before trial was to begin--notices of disposition concerning Mr. Robertson's and Mr. Torres' case were filed in district court. On Tuesday, May 11, counsel for the two defendants filed the original written plea agreements and stipulations of facts. The district court then issued a notice of hearing for change of plea on Wednesday, May 12.
 
 
 24
 Mr. Robertson and Mr. Torres appeared before the court ready to enter pleas prepared pursuant to F.R.Crim.P. 11(e). Mr. Robertson's plea agreement provided that in exchange for dropping certain charges, he would plead guilty to others. The government, pursuant to Rule 11(e)(1)(C), stipulated that a 120-month sentence was appropriate. Mr. Torres agreed to plead guilty to certain charges in exchange for dropping others. The government stipulated that a 121-month sentence was appropriate. In a hearing which lasted less than two minutes, the court ruled as follows:
 
 
 25
 The first problem is that you're all in violation of the local rule concerning plea agreements ten days before trial. You plead to the indictment, or you go to trial. That's the rule. I haven't heard any reason to waive the rule in this case.
 
 
 26
 Secondly, I'm not accepting 11(e)(1)(C) plea agreements in this case. If you want to plead to the indictment and take your chances, then that'll be something that I'll take a look at. Otherwise, this case is going to trial next Monday.
 
 
 27
 Court's in recess.
 
 
 28
 That same day, Messrs. Robertson and Torres filed a pleading titled "Motion to Waive Local Rule or, in the Alternative, to Continue Trial Date." In this motion, defense counsel acknowledged they had not strictly complied with the district court's "internal rule"[11] requiring that a change of plea hearing take place no less than ten days before trial, and requested that rule be waived. The government joined in the motion "as to the request to waive the Local Rule and Court's internal procedural requirements regarding changes of plea." The motion was filed at 4:34 p.m. and denied by minute order the same day.
 
 
 29
 On Thursday, May 13, a trial preparation conference was held, at which time Mr. Robertson and Mr. Torres made a record regarding the course of plea negotiations and both filed a motion to reconsider the court's ruling and rejection of the pleas the day before. The court, affirming its prior ruling, denied the motion stating:
 
 
 30
 I am not at all happy with the way this case has progressed. It seems to me the trial has been set well in advance, you've all known the rules well in advance, and I have heard absolutely no justification for this last minute maneuvering on the plea negotiation.
 
 
 31
 My procedures interpreting the Local Rule require not that I get a little piece of paper two sentences at the last minute telling me that the case has been disposed of. I want the case disposed of by plea the Friday before trial--the penultimate Friday before trial.
 
 
 32
 I don't have the luxury, as I said, of continuing this case for another week. And what you all have done by this last minute maneuvering is put the Court in a position where I can't schedule anything else at this point. I can't get any other case to go to trial. I already tried. I tried yesterday to get another case to go to trial next week in the event that this one could be tried at another time, and nobody can do it. And you all understand that because if the roles were reversed, you wouldn't be able to do it either, I dare say.
 
 
 33
 So I'm just not going to permit it. I'm going to enforce the Local Rule and my procedures, and obviously there's a certain bullheadedness about that because I've got plenty of other things to do besides try a case....
 
 
 34
 So I'll entertain nothing less than a plea to the indictment from all of the defendants, and otherwise, you're going to trial.
 
 
 35
 Mr. Robertson declined to plead guilty to the indictment and the case against him proceeded to trial, which lasted eight days. He was convicted and eventually sentenced to life in prison. Mr. Torres, on the advice of counsel, entered an unconditional plea of guilty to the indictment and was sentenced to 280 months in prison and five years supervised release.
 
 A. The Unconditional Plea of Guilty
 
 36
 Mr. Torres entered an unconditional plea of guilty to the charges against him. He concedes, as he must, that entry of an unconditional guilty plea results in the waiver of all nonjurisdictional defenses. United States v. Davis, 900 F.2d 1524, 1525-26 (10th Cir.), cert. denied, 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990). Mr. Torres argues, however, his plea must be withdrawn due to the ineffective assistance of trial counsel.
 
 
 37
 We have consistently held that the preferred method for challenging the effectiveness of counsel is by collateral attack pursuant to 28 U.S.C. Sec. 2255, because such claims often require consideration of evidence not contained in the record on appeal. See United States v. Galloway, 32 F.3d 499, 501-02 (10th Cir.1994) (citing Beaulieu v. United States, 930 F.2d 805, 806-07 (10th Cir.1991)). Mr. Torres argues his trial counsel was ineffective for three reasons, two of which concern alleged representations made by counsel to Mr. Torres concerning his guilty plea. There is nothing in the record before us bearing on whether, and under what circumstances those representations were made. The third basis alleges the failure to comply with the district court's internal rule constituted ineffective assistance of counsel. While it is clear from the record the rule was not complied with, the reasons for noncompliance and circumstances surrounding it are not fully elucidated in the record.
 
 
 38
 As such, Mr. Torres' ineffective assistance of counsel claim cannot be assessed in this proceeding. Because his argument concerning the district court's denial of the plea agreement is premised on that claim, that argument cannot be assessed as it pertains to Mr. Torres in this proceeding either. We note, however, Mr. Torres has preserved the issue for collateral attack under 28 U.S.C. Sec. 2255. Therefore, we dismiss this claim without prejudice to Mr. Torres' right to pursue relief under Sec. 2255. See United States v. Yates, 22 F.3d 981, 986 (10th Cir.1994).
 
 B. Mr. Robertson's Plea
 
 39
 The district court based its decision to reject Mr. Robertson's guilty plea on four independent grounds: (1) the local rule had not been complied with; (2) the internal rule had not been complied with; (3) considerations pertaining to the docket and scheduling calendar of the district court; and (4) the court categorically would not accept any pleas pursuant to 11(e)(1)(C). We address each rationale in turn.
 
 
 40
 Local Rule 40.1H United States District Court for the District of Colorado, provides: "No plea agreement involving dismissal of charges will be accepted unless written notification of the agreement is received by the court no later than ten (10) days before the Monday of the week set for the trial." On Friday, May 7, Mr. Robertson presented written notification a plea agreement had been reached. Trial was set to commence on Monday, May 17. The ten-day notification requirement of the local rule was met.
 
 
 41
 The district court's order suggests, however, the local rule was not complied with because the notification given was inadequate. At the May 13 trial preparation conference, the district court, in affirming the conclusion that the local rule had not been complied with, referred not to dates and the ten-day notification requirement but rather, that "the Local Rule require[s] not that I get a little piece of paper two sentences at the last minute telling me that the case has been disposed of."
 
 
 42
 The "little piece of paper" referred to was the government's notification, filed on May 7, which stated:
 
 
 43
 COMES NOW the United States of America (hereinafter "Government"), by and through its undersigned Assistant United States Attorney, to notify the court that a plea disposition has been reached in the above-captioned case. Undersigned counsel is filing this notice at the request of counsel for the defendant, Mr. Japha, who is out of the state on legal business.
 
 
 44
 We find nothing ambiguous about this document. It states a disposition had been reached between Mr. Robertson and the government and notified the court Mr. Robertson intended to change his plea of not guilty to guilty. While it is clear the notification could have said something more about the terms of the plea agreement, it is equally clear the failure to do so is immaterial. Local Rule 40.1H requires not that the terms of an agreement be detailed, only that a district court be informed of the existence of an agreement. There is no doubt but Mr. Robertson's "written notification of the agreement," Rule 40.1H, was just that--written notification of the agreement. Mr. Robertson's notification that a plea agreement had been reached complied with Local Rule 40.1H and, therefore, can not support the district court's decision to reject the plea.
 
 
 45
 The district court's second rationale for rejecting Mr. Robertson's plea agreement was the failure to comply with the court's internal rule regarding plea agreements. The rule provides:7. Changes of Plea. I strictly enforce the provisions of local rule 40.1H and require that all proposed pleas of guilty be heard no later than ten days before the beginning of the week in which trial is set to commence. In order to avoid last-minute uncertainty in the scheduling, travel, and appearance of trial witnesses and jurors in the event that the plea of guilty is not accepted, such hearings will ordinarily be set for the Friday of the penultimate week before the week of trial. A copy of the "Plea Agreement and Statements of Facts Relevant to Sentencing" (see General Order 1987-5 [D.Colo. Dec. 1, 1987] shall be delivered to my chambers no later than (a) 5:00 o'clock p.m. on the Wednesday preceding a Friday hearing or (b) 48 hours before any hearing which may, because of extraordinary circumstances, be scheduled at another time.
 
 
 46
 Rule III.7.
 
 
 47
 Mr. Robertson argues this internal rule cannot be given effect as it conflicts with the applicable Local Rule for the District of Colorado. In response, the government asserts it makes no difference whether the rule violated was the local rule or the court's internal rule because Mr. Robertson "was on notice of what was required, and the parties did not attempt to comply until just before trial. This is untimely."
 
 
 48
 Rule 57 of the Federal Rules of Criminal Procedure provides, in pertinent part:
 
 
 49
 Each district court by action of a majority of the judges thereof may from time to time, after giving appropriate public notice and an opportunity to comment, make and amend rules governing its practice not inconsistent with these rules.... In all cases not provided for by rule, the district judges and magistrate judges may regulate their practice in any manner not inconsistent with these rules or those of the district in which they act.
 
 
 50
 F.R.Crim.P. 57 (emphasis added).
 
 
 51
 Local Rule 40.1H prescribes the requirements for notifying a court of the existence of a plea agreement. Adoption of that rule clearly is within the District of Colorado's power under Rule 57. Rule 57, however, permits the adoption of internal rules only when two circumstances exist. First, the district as a whole has not adopted a rule bearing on the same matter, and second, so long as the internal rule is not inconsistent with the federal rules or other district-wide rules.
 
 
 52
 The district court's internal rule governs cases for which a local rule is provided. Both address the procedural requirements for notification a plea agreement has been reached.[12] As such, adoption of the district court's internal rule is proscribed by Rule 57. The fact defendants had notice of the district court's internal rule, as the government points out, is inapposite. The district court's internal Rule III.7 cannot be given effect as it violates the dictates of Rule 57. Thus, noncompliance with that rule does not provide a permissible basis for the refusal to accept the proposed guilty plea.
 
 
 53
 The district court additionally rejected Mr. Robertson's plea agreement on the grounds it would "not accept[ ] 11(e)(1)(c) plea agreements in this case" and concerns relating to the court's calendar. Mr. Robertson argues the district court erred in rejecting the tendered plea agreement without articulating a sound reason for doing so. The gravamen of the government's response is that "blanket prohibition of particular pleas likely is not error" and given the district court's long involvement in the case, it is likely the court did not err in rejecting the pleas.[13]
 
 
 54
 In addressing the question of whether, and under what circumstances a district court may reject a plea agreement entered into between the defendant and government, our starting point is Rule 11 which describes the procedures for the acceptance or rejection of those agreements. Rule 11(e)(2) provides "the court may accept or reject the agreement." While Rule 11 vests district courts with the discretion to accept or reject plea agreements, the rule does not define the criteria to be applied in doing so. See 1 Charles A. Wright, Federal Practice & Procedure Sec. 175.1 (1982). On the contrary, so long as district courts exercise sound judicial discretion in rejecting a tendered plea, Rule 11 is not violated. Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 498-99, 30 L.Ed.2d 427 (1971).
 
 
 55
 In attempting to identify the parameters of the abuse of discretion standard in this context, it is important to distinguish between the four types of plea bargains contemplated under Rule 11(e)(1): charge bargains, predicated on the dismissal of some counts; sentence bargains, predicated either on the recommendation of or agreement not to oppose a particular sentence; bargains predicated on the guarantee of a particular sentence; and hybrid bargains containing part charge and part sentence bargains. The different types of plea bargains implicate different types of discretion and power.
 
 
 56
 Both forms of sentence bargains implicate judicial discretion by limiting the sentencing power of the district court. United States v. Miller, 722 F.2d 562, 564 (9th Cir.1983). Within the statutorily prescribed range, imposition of sentence is a matter of discretion for the district court. 3 Charles A. Wright, Federal Practice & Procedure Sec. 526 (1982) (citing United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972)). Thus, the prosecution's role in sentencing bargains is strictly advisory. United States v. Adams, 634 F.2d 830, 835 (5th Cir.1981).
 
 
 57
 In contrast, charge bargains implicate executive discretion with respect to charging decisions. Charging decisions are primarily a matter of discretion for the prosecution, the representatives of the executive branch of government, who "are not mere servants of the judiciary." Miller, 722 F.2d at 565. Case law clearly establishes that separation of powers mandates the judiciary remain independent of executive affairs and vice versa. See Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668-69, 54 L.Ed.2d 604 (1978); United States v. Cox, 342 F.2d 167, 171 (5th Cir.), cert. denied, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). This principle is also established by the Federal Rules of Criminal Procedure.[14]
 
 
 58
 Though charging decisions implicate executive power, they also implicate the sentencing discretion of district courts. See Carrigan, 778 F.2d at 1464 (recognizing, in dicta, that charging decisions "restrict the district court's ability to impose what it considered an appropriate sentence."). However, the court's sentencing discretion is implicated only as an incidental consequence of the prosecution's exercise of executive discretion. In fact, a court's sentencing discretion is implicated in this situation in precisely the same manner it is implicated by prosecutorial decisions to bring charges in the first place, where prosecutorial discretion is nearly absolute. As such, charge bargains directly and primarily implicate prosecutorial discretion whereas judicial discretion is impacted only secondarily. Thus, while district courts may reject charge bargains in the sound exercise of judicial discretion, concerns relating to the doctrine of separation of powers counsel hesitancy before second-guessing prosecutorial choices.
 
 
 59
 Courts do not know which charges are best initiated at which time, United States v. Lovasco, 431 U.S. 783, 793-94 [97 S.Ct. 2044, 2050-51, 52 L.Ed.2d 752 (1977), which allocation of prosecutorial resources is most efficient, United States v. Ammidown, 497 F.2d 615, 621 (D.C.Cir.1973), or the relative strengths of various cases and charges. See Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv.L.Rev. 1521, 1547 (1981).
 
 
 60
 Miller, 722 F.2d at 565.
 
 
 61
 A district court's discretion to reject plea agreements is not without limit and varies depending on the content of such a bargain. Accordingly, we hold that in order to insure district courts exercise sound judicial discretion and adequately respect the principle of prosecutorial independence, courts must set forth, on the record, the prosecution's reasons for framing the bargain and the court's justification for rejecting it. See Moore, 916 F.2d at 1135-36 (requiring district courts to articulate a sound reason for rejecting a guilty plea on the record); Miller, 722 F.2d at 566 (same); United States v. Delegal, 678 F.2d 47, 50 (7th Cir.1982) (same); Ammidown, 497 F.2d at 623 (same). Requiring district courts to articulate the reasons for rejecting a plea agreement not only helps insure the court is aware of and gives adequate deference to prosecutorial discretion, it is the surest, indeed the only way to facilitate appellate review of rejected plea bargains. Mindful of these principles, we turn to Mr. Robertson's proffered plea agreement and the district court's rejection of it.
 
 
 62
 Mr. Robertson's plea agreement was neither a pure charge bargain nor a pure sentence bargain, but a hybrid. In exchange for dismissing certain charges, he agreed to plead guilty to others. In addition, the government agreed a particular sentence was appropriate for the charges to which Mr. Robertson pled. Thus, the plea agreement directly implicates both judicial and prosecutorial discretion.
 
 
 63
 The district court expressed concern pertaining to its docket as a rationale for rejecting the plea agreement. The court stated:
 
 
 64
 I don't have the luxury, as I said, of continuing this case for another week. And what you all have done by this last minute maneuvering is put the Court in a position where I can't schedule anything else at this point. I can't get any other case to go to trial. I already tried. I tried yesterday to get another case to go to trial next week in the event that this one could be tried at another time, and nobody can do it. An you all understand that because if the roles were reversed, you wouldn't be able to do it either, I dare say.
 
 
 65
 So I'm just not going to permit it.
 
 
 66
 In our judgment, rejecting Mr. Robertson's plea agreement for this reason constitutes an abuse of discretion. See Moore, 916 F.2d at 1136 n. 11 (when no plea cutoff date has been missed and "the Government makes its first plea offer to a defendant the morning of trial and defendant accepts, the rejection of the plea under those circumstances may well constitute an abuse of discretion."). While there is no doubt a district court has considerable authority in managing its docket, scheduling concerns alone are not of sufficient importance to justify the infringement of prosecutorial discretion resulting here. As explained above, Mr. Robertson's plea agreement directly implicated both judicial and prosecutorial discretion. While the district court has considerable leeway in rejecting the bargain based on its sentencing aspect, its discretion is more limited when its decision is based on the bargain's charging aspect. In our judgment, rejecting a plea implicating both branches of government solely out of concern for the district court's scheduling is, under the facts of this case, impermissible.
 
 
 67
 Lastly, in rejecting the plea, the district court flatly stated that no "11(e)(1)(c) plea agreements" would be accepted in the case. While no rationale for doing so was articulated, the import of the district court's statement is clear. Rule 11(e)(1)(C) agreements are those in which the government guarantees a particular sentence to a defendant. As such, 11(e)(1)(C) pleas directly and unequivocally infringe on the sentencing discretion of district courts. In our judgment, the court's categorical refusal to accept pleas pursuant to subsection (C) can only be understood as its refusal to completely yield its discretion in sentencing. There can be little doubt that rejecting a plea agreement due to the court's refusal to permit the parties to bind its sentencing discretion constitutes the exercise of sound judicial discretion.
 
 
 68
 As noted above, a district court's discretion to sentence within the applicable range is extremely broad. Because 11(e)(1)(C) agreements attempt to completely curtail that discretion, a district court's decision to preserve that aspect of judicial power is not an abuse of discretion. We conclude, therefore, the district court's refusal to accept Mr. Robertson's plea of guilty was based, in part, on reasons that constitute the sound exercise of judicial discretion and thus, the court's rejection of the plea agreement cannot be overturned on appeal.
 
 IV. TRIAL
 
 69
 * Mr. Robertson and Mr. Graves argue the district court erred in refusing to empanel a new jury. The venire drawn consisted of one African American. This prospective juror was excused due to her previous plans for a vacation in Europe for which she had prepaid. No objection was made to her excusal. Messrs. Robertson and Graves do not argue the jury pool itself was improper, or that it was error to have excused this single juror, or that the government improperly struck this potential juror. Rather, the argument is the district court erred in failing to empanel more African American jurors or empaneling an entirely new pool of prospective jurors once the sole African American in the original pool had been excused, because the jury pool no longer represented a fair cross section of the community.
 
 
 70
 A district court's decisions relating to errors in jury selection for a criminal trial are reviewed under an abuse of discretion standard. See United States v. Washita Constr. Co., 789 F.2d 809, 819 (10th Cir.1986) (citing Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 1634-35, 68 L.Ed.2d 22 (1981)). A criminal defendant has a Sixth Amendment right to a jury pool comprised of a fair cross section of the community. U.S. Const. amend. VI; Duren v. Missouri, 439 U.S. 357, 358-59, 99 S.Ct. 664, 665-66, 58 L.Ed.2d 579 (1979). A violation of this right occurs when a defendant is tried by a jury drawn from a source that, due to systematic exclusion of a distinctive group, fails to reflect a fair cross section of the community. Taylor v. Louisiana, 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975).
 
 
 71
 Mr. Robertson and Mr. Graves have made no attempt to show that any systematic exclusion of African Americans occurred here. By chance, the venire had one African American member who, again by chance, had previously existing plans that justified her excusal. Under these circumstances, it cannot be said that Messrs. Robertson's and Graves' Sixth Amendment rights have been violated. The district court did not abuse its discretion in refusing to empanel a new jury.
 
 B
 
 72
 Mr. Robertson and Mr. Graves argue the district court erred in permitting Bernadette Toney to testify on behalf of the government. The argument is twofold, premised on (1) the contention the government untimely disclosed previously ordered information concerning the witness and (2) the physical condition of the witness during her testimony. We review the district court's decision to admit testimony of a witness for abuse of discretion. United States v. Pino, 827 F.2d 1429, 1430 (10th Cir.1987).
 
 1.
 
 73
 Four months prior to trial, the district court granted a motion filed by Ms. Walker for impeaching information which included a request for Ms. Toney's records relating to her mental and physical history. Messrs. Robertson and Graves joined in this motion. After a number of other motions were filed, the court ordered the bulk of the records be given to defense counsel. It is alleged complete records concerning Ms. Toney's mental and physical history were never produced, though some of those records were received by defense counsel by noon on the Friday preceding trial and others over the weekend prior to trial.
 
 
 74
 Counsel for Mr. Robertson and Mr. Graves renewed their motions to exclude Ms. Toney's testimony prior to the testimony of the government's first witness, arguing the records provided were not turned over timely, the records were incomplete, and there had been no opportunity to consult with an expert regarding the significance of the records that were produced. No allegation was or is made that these violations were the result of bad faith on the part of the prosecution. The district court, in denying the motion, expressly found no bad faith.
 
 
 75
 Messrs. Robertson and Graves assert there was insufficient time to review the records and consult with an expert about them. Specifically, they argue the discovery violations limited their ability "to ask specific facts regarding Ms. Toney's physical ability to remember matters that might be physiologically affected by her drug addiction and abuse."
 
 
 76
 If at any time a court is informed of a discovery violation, it may order a party to permit discovery, grant a continuance, prohibit introduction of the undisclosed evidence, or "it may enter such other order as it deems just under the circumstances." F.R.Crim.P. 16(d)(2). Here, the court ordered Ms. Toney sign a release for additional information, informed the government she would not be allowed to testify if a release were not signed, and suggested additional defense counsel be appointed to consult with an expert during the trial. Under these circumstances, our review of the record convinces us the district court did not err in permitting Ms. Toney to testify and the drastic remedy of vacating a conviction for the violation of a discovery order is not warranted here, particularly in light of the fact that no bad faith has been alleged or found. See United States v. Dennison, 891 F.2d 255, 260 (10th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 663 (1990) (absent bad faith or prejudice, the extreme sanction of dismissal of an indictment generally is not appropriate sanction for discovery violations).
 
 
 77
 Messrs. Robertson and Graves acknowledge the trial court permitted extensive cross-examination of Ms. Toney. Our review of the record indicates defense counsel questioned Ms. Toney extensively regarding her drug addiction and use as well as her ability to remember past events. On cross-examination Ms. Toney admitted, inter alia, she had been a heroin addict, a heavy and prolonged user of crack cocaine, had used crack cocaine several times a day during the period she was testifying about, had suffered memory problems resulting from her drug abuse, had hearing problems, was a methadone user, and had used methadone the day she appeared in court to testify. Finally, Ms. Toney admitted she was addicted to methadone, greatly feared the prospect of not being able to use it, acknowledged methadone was not available in prison, and that in exchange for her testimony she would not be going to prison.
 
 
 78
 In short, counsel thoroughly impeached the witness with respect to the precise characteristics the sought after documents were intended to reveal, i.e., Ms. Toney's drug use and the effect of that use on her memory. In addition, we note Ms. Toney was only one of many prosecution witnesses who implicated Mr. Robertson and Mr. Graves in the crimes charged.
 
 
 79
 Messrs. Robertson and Graves have made no attempt to point to any specific prejudice arising from the discovery violations nor have they made any argument concerning the effect on the jury. See United States v. Behrens, 689 F.2d 154, 158 (10th Cir.1982) (defendants failed to demonstrate late disclosure of evidence deprived them of a fair trial; although cross-examination may have been enhanced with the evidence, no reasonable doubt as to guilt that did not otherwise exist was shown), cert. denied, 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982). Thus, we hold the failure of the government to produce all of the requested documents "would not have necessarily affected the outcome of the trial." United States v. Crouthers, 669 F.2d 635, 641 (10th Cir.1982) (citing Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)). As such, Messrs. Robertson and Graves were not denied their right to a fair trial by virtue of the alleged discovery violations. However, we caution government counsel against last-minute filings, which do little to promote the search for truth and much to provide defendants with legitimate grounds for appellate review.
 
 2.
 
 80
 Mr. Robertson and Mr. Graves also argue the district court erred in denying their motion to exclude Ms. Toney's testimony due to her physical condition at trial. During the course of her testimony, a side-bar conference was held, at which time the court stated Ms. Toney's demeanor caused it to believe she was "on something." Counsel for the defense requested a urinalysis be done so they could effectively cross-examine the witness. The district court denied the request noting Ms. Toney met the standards for a competent witness and concluded:
 
 
 81
 I'm just reluctant in this case to require a urinalysis, which is in interference with her rights, anyway. I think that you've drawn out as much as you can possibly draw out and I don't see that a urinalysis would help us that much. It might demonstrate that she's--at most--that she's still using crack and if she's still using crack, I would think that that's basically cumulative, anyway. Seems to me that she's been effective[ly] impeached as a drug addict.
 
 
 82
 In our opinion, the district court did not abuse its discretion in refusing to order Ms. Toney submit to a urinalysis. As our discussion above makes clear, and as the district court observed, Mr. Robertson and Mr. Graves cross-examined the witness extensively and amply demonstrated her use of and dependence on drugs as well as the effects those drugs had on her. This, in conjunction with the fact a court-ordered urinalysis undoubtedly would infringe on Ms. Toney's privacy rights, cf. Pino, 827 F.2d at 1430, supports the conclusion the district court was well within its discretion in allowing the witness to testify. The failure to order a urinalysis did not encumber the ability to effectively cross-examine the witness to such an extent as to deny Messrs. Robertson and Graves a fair trial.
 
 C
 
 83
 Mr. Graves argues there was insufficient evidence to support the district court's finding a conspiracy existed so as to allow co-conspirator hearsay statements. In addition, he argues the evidence presented at trial was insufficient to support the jury's finding of guilt. We disagree.
 
 
 84
 "In evaluating the sufficiency of the evidence, we must view the evidence--both direct and circumstantial, together with all reasonable inferences to be drawn therefrom--in the light most favorable to the government." United States v. Hooks, 780 F.2d 1526, 1529 (10th Cir.), cert. denied, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). A motion for judgment of acquittal is properly denied if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In order to admit co-conspirator statements, the offering party must prove by a preponderance of the evidence a conspiracy existed of which the defendant was a part. Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).
 
 
 85
 The essence of a drug conspiracy is an agreement between two or more persons to commit federal drug offenses. The evidence, whether direct or circumstantial, "must support a finding that the conspirators had a unity of purpose or a common design or understanding." Because a criminal conspiracy by its nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence.
 
 
 86
 United States v. Staggs, 881 F.2d 1546, 1550 (10th Cir.1989) (citations omitted).
 
 
 87
 Prior to the district court's ruling on the admissibility of the co-conspirator's statements, the testimony established, inter alia, Mr. Graves associated with Ms. Walker, Mr. Robertson, and Mr. Torres; he sold crack cocaine at the organization locations; he dealt crack cocaine with various persons; he was present when there was a raid at one of the organization's houses on Marion Street; he handled crack cocaine with Mr. Robertson; he handled cash along with Mr. Torres; gave money to Mr. Robertson at least a half-dozen times; provided crack cocaine for Mr. Sherman to sell; and had Ms. Toney rent hotel rooms for him which were used for the sale of crack cocaine.
 
 
 88
 Mr. Graves argues no evidence was presented establishing he actually entered into an agreement with anyone to violate the law by distributing crack cocaine. While Mr. Graves is correct in noting the testimony did not show an express agreement, it provides a sufficient circumstantial link between Mr. Graves and the conspiracy as charged. See United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.1988) (connection of defendant to conspiracy need only be slight if evidence establishes that connection beyond a reasonable doubt). As noted above, the existence of an express agreement is not a necessary precondition of finding a conspiracy to violate the laws. United States v. Roberts, 14 F.3d 502, 512 (10th Cir.1993); Staggs, 881 F.2d at 1550.
 
 
 89
 The testimony presented and the reasonable inferences that can be drawn therefrom inescapably lead to the conclusion a conspiracy existed to distribute crack cocaine of which Mr. Graves was an active member. As such, we conclude the evidence was sufficient both to permit the admission of co-conspirator hearsay statements and to support the jury's verdict.
 
 V. SENTENCING
 
 90
 * Mr. Torres argues the government breached the plea agreement accepted by the district court by agreeing to recommend one sentence and then recommending another.
 
 
 91
 Whether the government violates a plea agreement is a question of law subject to de novo review. United States v. Shorteeth, 887 F.2d 253, 256 (10th Cir.1989). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello, 404 U.S. at 262, 92 S.Ct. at 499; see also United States v. Pogue, 865 F.2d 226, 227 (10th Cir.1989); United States v. Greenwood, 812 F.2d 632, 637 (10th Cir.1987). In determining whether the government has violated the terms of a plea agreement, the court must look at what the defendant reasonably understood when the guilty plea was entered. United States v. Hand, 913 F.2d 854, 856 (10th Cir.1990); Shorteeth, 887 F.2d at 256; Pogue, 865 F.2d at 227.
 
 
 92
 The plea agreement Mr. Torres signed provided, in pertinent part, as follows:
 
 
 93
 F. The parties understand that the stipulation regarding criminal history of the defendant is tentative, and that the defendant is in a better position to know the relevant facts than is the government. The criminal history category is more completely and accurately determined by the Probation Department and additional facts regarding the criminal history can greatly affect the final guideline range. Nevertheless, what is known of the defendant's criminal history is as follows: 3 adult felony convictions. Based on that information, if no other information were discovered, the defendant's criminal history category would be Category V.
 
 
 94
 ....
 
 
 95
 H. The guideline range resulting from the offense level of (E) above, and the (tentative ) criminal history category of (F) above, is 140-175 months. The parties contemplate that a Section 5K1.1 motion will be filed, recommending a downward departure to a sentence of 121 months.
 
 
 96
 In its Sec. 5K1.1 motion, the government stated:
 
 
 97
 2. The government agreed to recommend a departure to 121 months upon its pre-plea belief that defendant's resulting guideline range would be 140-175 months, meaning that the departure under the Section 5K1.1 motion would be 19-54 months. Even if the court determines defendant to be a career offender, the government's recommendation for downward departure remains the same (19-54 months) based upon the value of the information provided.
 
 
 98
 3. Wherefore, the government recommends a downward departure of 19-54 months from the sentence which would otherwise be adjudged by the court.
 
 
 99
 Mr. Torres argues there is no reason to think, as the government contends on appeal, that when he "read in his final plea agreement that 'a Section 5K1.1 motion will be filed, recommending a downward departure to a sentence of 121 months', he understood that to mean 'that the departure under the Section 5K1.1 motion would be 19-54 months.' " Thus, he concludes that the plain language of the two documents establishes the government's breach of the plea agreement.
 
 
 100
 We agree with Mr. Torres' assertion it is not reasonable to think that in reading his plea agreement, he would have thought the government was agreeing to nothing more than a nineteen to fifty-four-month departure. However, it is quite clear what the government had agreed to was conditional on the probation department's findings with respect to his criminal history. The plea agreement specifically informed Mr. Torres the conclusions regarding his criminal history were tentative, it would be more fully and accurately determined later, and criminal history can greatly affect the guideline range. Finally, the plea agreement's recommendation of downward departure to 121 months from the guideline range of 140-175 months was expressly premised on the "tentative" criminal history category of V.
 
 
 101
 Thus, there is no question but that it would not have been reasonable for Mr. Torres to think anything other than the government's 121-month recommendation was conditional on his criminal history. The validity of Mr. Torres' argument falters then, on the fact it was indeed his criminal history that led the government to back away from its 121-month recommendation. The presentence investigation report prepared by the probation department stated, in part:
 
 
 102
 The plea agreement indicates that the defendant's criminal history category is category V, which results in a sentencing range of 140 to 175 months. The Probation Department has determined that the defendant[']s criminal history category is VI, and pursuant to U.S.S.G. Sec. 4B1.1 is a career offender, which increases the total offense level to 34 and his guideline range of imprisonment to 262-327 months. It is also noted that in the plea agreement ... "The parties contemplate that a Sec. 5K1.1 motion will be filed, recommending a downward departure to a sentence of 121 months." ... [The probation department] note[s] that a downward departure of in excess of 50 percent would be required to reach the guideline range of 121 months.
 
 
 103
 The court accepted the factual matters contained in the presentence report that formed the basis for the probation department's calculation of Mr. Torres' criminal history category. While the failure to object to a breach of a plea agreement ordinarily does not waive the issue, Shorteeth, 887 F.2d at 255, it is of some significance to note Mr. Torres' trial counsel did not object because in her judgment,
 
 
 104
 under the proposed agreement or sentencing guideline computation that we entered into at the time he pled guilty to the offenses, there was some kind of an idea that he would be able to be sentenced in the 121-month range. Obviously, given the Probation Department's investigation and the fact that he is in the career criminal category, that is impossible.
 
 
 105
 The government's recommendation of a 121-month sentence clearly was conditional on Mr. Torres' criminal history. His criminal history was later revealed to be substantially different from what it was believed to be at the time the plea agreement was entered into. As such, we conclude the government did not breach its plea agreement in recommending a downward departure of nineteen to fifty-four months.[15]
 
 B
 
 106
 Mr. Graves argues the district court erred in calculating his base offense level. More specifically, he claims the district court erred in converting the 871 grams of powder cocaine seized as part of the controlled delivery to the Marion Street house into the amount of crack cocaine that could have been produced from the powder. We review the district court's application of the sentencing guidelines de novo. United States v. Wagner, 994 F.2d 1467, 1470 (10th Cir.1993). We review the sentencing court's factual findings under a clearly erroneous standard, "afford[ing] due deference to the district court's application of the Guidelines to the facts." United States v. Easterling, 921 F.2d 1073, 1077 (10th Cir.1990), cert. denied, 500 U.S. 937, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991).
 
 Mr. Graves asserts:
 
 107
 Because the sentencing guidelines specifically provide a method to calculate the applicable base offense level where two different kinds of drugs are involved, it is error as a matter of law to engage in extrapolation of the amount of powder cocaine that can be converted into crack cocaine....
 
 
 108
 We are not persuaded.
 
 
 109
 In United States v. Angulo-Lopez, 7 F.3d 1506 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1563, 128 L.Ed.2d 209 (1994), we held:
 
 
 110
 According to U.S.S.G. Sec. 2D1.4 (1991), "[i]f a defendant is convicted of a conspiracy or an attempt to commit an offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." The district court made the factual determination that the cocaine powder involved in the conspiracy was routinely converted to crack. The eventual conversion was foreseeable to, if not directed by, Mr. Angulo-Lopez. Under the guidelines, it is proper to sentence a defendant under the drug quantity table for cocaine base if the record indicates that the defendant intended to transform powdered cocaine into cocaine base. See United States v. Paz, 927 F.2d 176, 180 (4th Cir.1991); United States v. Haynes, 881 F.2d 586, 592 (8th Cir.1989). The record supports the district court's findings that Mr. Angulo-Lopez intended the powdered cocaine to be converted into crack.
 
 
 111
 Id., 7 F.3d at 1511.
 
 
 112
 Each and every factual observation referenced in the above quote applies equally to the case of Mr. Graves. First, Mr. Graves was charged with conspiracy to distribute crack cocaine. See infra footnote 4. The district court specifically found no "plain cocaine" was ever distributed as part of this conspiracy, and the conversion of powder to crack cocaine as well as the total amount of drugs distributed by the conspiracy was reasonably foreseeable to Mr. Graves. These factual findings are supported by the evidence. Accordingly, the legal conclusion of Angulo-Lopez is directly on point. We therefore reject Mr. Graves' argument the sentencing guidelines prohibit the district court from converting powder cocaine to crack cocaine.
 
 C
 
 113
 Mr. Robertson also argues the district court erred in converting the powder to crack cocaine in fixing his base offense level. Mr. Robertson's claim differs from that of Mr. Graves because unlike the other defendants, Mr. Robertson was charged not only with conspiracy to distribute crack cocaine, but also with possession with intent to distribute powder cocaine. See infra footnote 3. Because he was actually charged with crimes pertaining to multiple drug types, Mr. Robertson concludes he must be sentenced pursuant to the drug equivalency tables provided by the sentencing guidelines.
 
 
 114
 Section 2D1.1 (n. 6) provides that "[w]here there are multiple transactions or multiple drug types, the quantities of drugs are to be added. Tables for making the necessary conversions are provided." The conversion or drug equivalency tables instruct that when different types of drugs are involved, each drug is to be converted to its marihuana equivalent, and the aggregate amount of marihuana arrived at is to be used as the total amount of drugs involved for purposes of fixing the defendant's base offense level. All of the specific examples of such conversions provided in the guidelines deal with crimes involving distinct drugs. See U.S.S.G. Sec. 2D1.1 ex. A (converting PCP and LSD); ex. B (converting marihuana and diazepam); ex. C (converting cocaine and marihuana).
 
 
 115
 In contrast to the situations presented in the guideline, the case against Mr. Robertson involves interdependent, though different drugs: crack cocaine and the primary and necessary ingredient of crack, cocaine powder. While cases involving these two drugs are not per se distinguishable from the guideline examples, the fact that Mr. Robertson was convicted of conspiring to distribute crack cocaine permits his sentence to be fixed without reference to the drug equivalency tables.[16]
 
 
 116
 A defendant convicted of a drug conspiracy is sentenced based on the total amount of drugs involved as if the object of the conspiracy had been completed, Angulo-Lopez, 7 F.3d at 1511, provided that the drug quantities were reasonably foreseeable to the defendant and within the scope of his conspiratorial agreement. United States v. Irvin, 2 F.3d 72, 75 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994). As noted above, the district court specifically found that the conspiracy for which Mr. Robertson was convicted involved only the distribution of crack cocaine, and that no powder cocaine was ever distributed by the conspirators. Thus, it clearly was reasonable to conclude that the powder cocaine would be made into crack cocaine in furtherance of the conspiracy and thus, permissible under the guidelines to sentence Mr. Robertson as if the object of the conspiracy, i.e., "cooking" the powdered cocaine to make crack cocaine and distributing crack cocaine, had been achieved.
 
 
 117
 Mr. Robertson's additional conviction for possession with intent to distribute powder cocaine does not render the principle of Angulo-Lopez, inapplicable. Indeed, the defendant in Angulo-Lopez, like Mr. Robertson, was convicted of conspiracy to distribute crack cocaine as well as distribution of powder cocaine. Id., 7 F.3d at 1508, 1511. Nevertheless, we held that under the guidelines, it was permissible to convert the powder cocaine to crack cocaine. Mr. Robertson has not been sentenced both for conspiring to distribute crack cocaine based on the amount of powder cocaine seized and for possession of that powder cocaine. Rather, he has been sentenced only for conspiring to distribute crack cocaine. Accordingly, we conclude that the district court did not err in converting the powder cocaine to crack cocaine in fixing Mr. Robertson's base offense level.
 
 D
 
 118
 Messrs. Robertson and Graves additionally argue the district court erred in converting the powder to crack cocaine is because crack cocaine carries what are characterized as "draconian" sentences as compared to powder cocaine. Messrs. Robertson and Graves argue the enhanced sentences for crack cocaine violate equal protection of the laws and constitute cruel and unusual punishment. They both acknowledge this argument is foreclosed by our case law. See, e.g., Angulo-Lopez, 7 F.3d at 1508-09 (rejecting equal protection and Eighth Amendment challenges); United States v. Easter, 981 F.2d 1549, 1556, 1558-59 (10th Cir.1992) (upholding the validity of the sentencing guidelines' treatment of crack cocaine against constitutional attack), cert. denied, --- U.S. ----, 113 S.Ct. 2448, 124 L.Ed.2d 665 (1993).
 
 E
 
 119
 Mr. Robertson argues the district court erred in fixing his sentence.
 
 1.
 
 120
 First, Mr. Robertson asserts the district court erred by failing to notify him of its intention to reject the recommendation of the prosecution and probation department as to the applicable offense level. In support, he cites United States v. Kalady, 941 F.2d 1090 (10th Cir.1991). In Kalady, we noted under Rule 32, a sentencing court must, " '[p]rior to the sentencing hearing ... provide the counsel for the defendant and the attorney for the Government with notice of the probation officer's determination, pursuant to the provisions of subdivision (c)(2)(B), of the sentencing classification and sentencing guideline range believed to be applicable to the case,' " id. at 1096 (quoting F.R.Crim.P. 32 (emphasis omitted)), and concluded the Rule's requirements "must be read to apply equally to departure and non-departure sentences." Id. at 1097.
 
 
 121
 In Burns v. United States, 501 U.S. 129, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), the Supreme Court emphasized "Rule 32 contemplates full adversary testing of the issues relevant to a Guidelines sentence and mandates that the parties be given 'an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence.' " Id. at 135, 111 S.Ct. at 2186 (quoting F.R.Crim.P. 32(a)(1)).
 
 
 122
 The opportunity recognized in Burns and Kalady was denied, Mr. Robertson argues, because the government argued in favor of a two-level decrease for acceptance of responsibility whereas the probation department thought no decrease was warranted; the government opined Mr. Robertson should receive a two-level enhancement for his role in the offense, the probation department proposed a four-level enhancement; and the prosecution urged the 871 grams of powder cocaine be treated as, at a minimum, 500 grams of crack cocaine,[17] whereas the probation department urged the powder cocaine be treated as such.
 
 
 123
 Because the district court, "in combining all of these things, arrived at a different base offense level than did the government or the probation department," Mr. Robertson argues he was left "without a meaningful opportunity to focus on the legal and factual issues at sentencing." We disagree.
 
 
 124
 First, it is important to recognize Mr. Robertson had been given notice of the probation officer's recommendation as required under Kalady and was given an opportunity to comment on that recommendation as required under Burns.
 
 
 125
 Second, there is no question Mr. Robertson was not denied a meaningful opportunity to focus on the legal and factual issues at sentencing. He was notified in advance of the sentencing hearing of each and every factor the district court relied on in sentencing him. He was aware of: the probation department's and prosecution's recommended base offense level; the difference of opinion concerning his acceptance of responsibility; the difference of opinion regarding his role in the offense; and the different proposed methods of dealing with the 871 grams of powder cocaine.
 
 
 126
 At the sentencing hearing, Mr. Robertson specifically addressed each of these issues as they related to his sentence. As such, it cannot seriously be maintained that he was denied an opportunity to focus on the relevant issues at sentencing--he was notified of those issues and, indeed, was prepared to and did in fact argue his position with respect to those issues. Thus, we conclude Mr. Robertson was not prejudiced by the district court's failure to notify him of its intention to reject the specific offense level proposed by the prosecution and the probation department.
 
 2.
 
 127
 Mr. Robertson next argues that his life sentence violates the Eighth Amendment's guarantee against cruel and unusual punishment. The evidence established Mr. Robertson was involved in a conspiracy to distribute more than fifty grams of cocaine and possession with intent to distribute more than 500 grams of powder cocaine.
 
 
 128
 In Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), a plurality of the Supreme Court upheld a conviction of life without the possibility of parole for the possession of 650 grams of cocaine against an Eighth Amendment challenge. As we recognized in Angulo-Lopez, "because the Court affirmed a sentence of life imprisonment for the possession of 650 grams of powdered cocaine in Harmelin, we can logically assume that the defendant's life sentence for masterminding a conspiracy involving 47.82 kilograms of crack cocaine does not violate the Eighth Amendment." Angulo-Lopez, 7 F.3d at 1510. This same reasoning applies here. Since Mr. Robertson was sentenced for leading a conspiracy involving 871 grams of cocaine, it is safe to assume his sentence does not violate the Eighth Amendment. See Easter, 981 F.2d at 1556 (since defendant received a lesser sentence for possession of cocaine than that sanctioned in Harmelin, it follows that no Eighth Amendment violation occurred).
 
 
 129
 Mr. Robertson apparently urges we apply a proportionality review to assess the constitutionality of his sentence.[18] Assuming, arguendo, a proportionality review is appropriate, see Angulo-Lopez, 7 F.3d at 1510 (declining to opine whether Harmelin overruled the three-part proportionality review of Solem ), we conclude Mr. Robertson's life sentence is not disproportionate to the crimes for which he was convicted.
 
 
 130
 Mr. Robertson first points out that under his sentence, he "will not be present to watch his two sons grow" and that this should be a factor considered in his sentencing. This fact was noted in the presentence report that the trial court indicated it had reviewed prior to sentencing Mr. Robertson. Mr. Robertson does not address the fact he was adjudged the head of the conspiracy to distribute crack cocaine in addressing the gravity-of-the-offense component of a proportionality review; rather, he focuses solely on the amount of drugs involved in the crimes for which he was convicted. In light of Harmelin, this observation offers little support for his argument. In addition, he fails to address the sentences imposed for the commission of the same crime in this or other jurisdictions. See Angulo-Lopez, 7 F.3d at 1509. As such, Mr. Robertson has failed to explain why the sentence he received violates his Eighth Amendment rights.
 
 
 131
 Mr. Robertson also contends because his prior criminal acts were considered in computing his criminal history category under the guidelines, those acts could not be considered again in determining what sentence to impose within the permissible guideline range. Specifically, he takes issue with the district court's reference to a drive-by shooting Mr. Robertson was convicted of in California. In articulating its reasons for choosing a specific sentence within the applicable guideline range, the district court noted Mr. Robertson's "extended and serious criminal history, including the drive-by shooting that was alluded to by the government."
 
 
 132
 Mr. Robertson offers no authority in support of this argument. We note, however, district courts have broad discretion in sentencing a defendant within the range prescribed by Congress. 3 Charles A. Wright, Federal Practice & Procedure Sec. 526 (1982). ("Subject only to the limitations imposed in the statutes and Constitution, the punishment to be given a convicted offender is in the discretion of the court" (citing United States v. Tucker, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972))). In addition, the guidelines specifically provide that in choosing a term of imprisonment within the guideline range, courts "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. Sec. 1B1.4. There is no question but that Mr. Robertson's prior criminal convictions constitute the sort of background, character and conduct of a defendant relevant in determining where, within the applicable range, a defendant should be sentenced.
 
 
 133
 Mr. Robertson has failed to offer any arguments or legal authority that support his contention his life sentence violates the Eighth Amendment's proscription against cruel and unusual punishment.
 
 3.
 
 134
 Mr. Robertson argues the district erred in enhancing his offense level by four, finding he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. Sec. 3B1.1(a). We review a district court's determination a defendant was a leader or organizer of a criminal venture under the clearly erroneous standard. United States v. Litchfield, 959 F.2d 1514, 1521 (10th Cir.1992).
 
 
 135
 Key determinants of the applicability of Sec. 3B1.1 are control or organization: "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime. This requirement is implicit in the terms 'organizer, leader, manager and supervisor,' each of which suggests the presence of underlings or subordinates."
 
 
 136
 United States v. Reid, 911 F.2d 1456, 1464 (10th Cir.1990) (quoting United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir.1990)), cert. denied, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). In determining whether there were five or more participants as required under Sec. 3B1.1(a), the defendant may be counted. Reid, 911 F.2d at 1464.
 
 
 137
 The testimony at trial supports the conclusion Mr. Robertson " 'exercised some degree of control over others involved in the commission of the offense or [was] responsible for organizing others for the purpose of carrying out the crime.' " Id. Dwight Sherman testified Mr. Robertson would come to his house once or twice a day while crack cocaine was being sold there, giving instructions to Mr. Sherman as well as others who were selling crack cocaine. Though he could afford to pay the rent on his house, Mr. Sherman testified Mr. Robertson paid the rent as part of "the mind control where [Mr. Robertson] wanted to just to take over the house itself and he would call the shots." He also testified he would give money from the sale of crack cocaine to Mr. Graves, who in turn would give it to Mr. Robertson. Finally, Mr. Sherman testified Mr. Graves frequently received crack cocaine from Mr. Robertson while at the house.
 
 
 138
 Ms. Toney testified Mr. Graves frequently spoke about how Mr. Robertson would receive cocaine from Los Angeles and distribute it to different people in Colorado, including Ms. Walker and Mr. Graves. Ms. Toney also testified Mr. Robertson would frequently say Ms. Walker and Mr. Graves owed him money and inquire as to who was working at particular houses and whether they also owed him money. Finally, she testified Mr. Robertson frequently gave her money to do things for him such as bail people out of jail and wire money.
 
 
 139
 In our judgment, this testimony is sufficient to support the district court's finding Mr. Robertson was the organizer or leader of a criminal organization consisting of five or more participants.
 
 4.
 
 140
 Finally, Mr. Robertson alleges the district court erred in refusing to decrease his base offense level by two points for acceptance of responsibility under U.S.S.G. Sec. 3E1.1. District courts have broad discretion to grant or deny the reduction for acceptance of responsibility, U.S.S.G. Sec. 3E1.1 comment (n. 5), and thus, our review is under the clearly erroneous standard. United States v. Jessup, 966 F.2d 1354, 1356 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1398, 122 L.Ed.2d 772 (1993). The guidelines specifically note that
 
 
 141
 "[a] defendant who enters a guilty plea is not entitled to a sentencing reduction ... as a matter of right." U.S.S.G. Sec. 3E1.1(c), and only "[i]n rare situations [may] a defendant clearly demonstrate an acceptance of responsibility ... even though he exercises his constitutional right to a trial" and puts the government to its burden of proof. U.S.S.G. Sec. 3E1.1, comment. (n. 2).
 
 
 142
 United States v. Dahlman, 13 F.3d 1391, 1399 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1575, 128 L.Ed.2d 218 (1994).
 
 
 143
 Mr. Robertson asserts because he was willing to enter a plea of guilty, see, supra, pp. 1429-30, this evinces his acceptance of responsibility. The district court recognized, however, Mr. Robertson was not willing to plead to the indictment nor did he choose to plead guilty to some of the counts charged in the absence of a plea agreement. In addition, Mr. Robertson made no form of confession, nor did he ever actually admit guilt and accept responsibility prior to his conviction.[19] See United States v. Ochoa-Fabian, 935 F.2d 1139, 1142 (10th Cir.1991) (reduction properly refused defendant who denied essential elements of offense, was convicted at trial, and only afterward admitted guilt and expressed remorse), cert. denied, --- U.S. ----, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). Thus, we conclude the district court did not err in refusing to grant a two-point reduction for acceptance of responsibility.
 
 F
 
 144
 Mr. Graves argues the district court erred in increasing his base offense level by two points for possession of a weapon under U.S.S.G. Sec. 2D1.1(b). He argues no evidence was presented indicating any weapon was used as an integral part of drug trafficking or that any weapon was shown to have increased the likelihood of success of any drug trafficking. We review the district court's factual determination of whether an enhancement for possession of a dangerous weapon is warranted for clear error. United States v. Jackson, 11 F.3d 953, 956 (10th Cir.1993).
 
 
 145
 In United States v. Roederer, 11 F.3d 973 (10th Cir.1993), we recognized " '[w]eapon possession is established [for purposes of Sec. 2D1.1(b)(1) ] if the government proves by a preponderance of the evidence "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." ' " Id. at 982 (quoting United States v. Eastland, 989 F.2d 760, 770 (5th Cir.), cert. denied, --- U.S. ---- & ----, 114 S.Ct. 246 & 243, 126 L.Ed.2d 200 (1993)). If the government carries its burden, the defendant must show it is "clearly improbable" that the weapon was related to the offense. See Jackson, 11 F.3d at 956, United States v. Chatman, 994 F.2d 1510, 1517 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 230, 126 L.Ed.2d 185 (1993).
 
 
 146
 Contrary to the contention of Mr. Graves and the prosecution, the testimony did not establish that Mr. Graves merely purchased a firearm from one of his customers. On the contrary, Ms. Scott testified she sold Mr. Graves a .25 caliber gun for "fifty dollars worth of dope."
 
 
 147
 The charges against Mr. Graves stem from his involvement in a conspiracy to distribute crack cocaine. Mr. Graves acquired the weapon by virtue of his drug trafficking activity. That Mr. Graves received a weapon from Ms. Scott in exchange for drugs unquestionably establishes a " 'temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant.' " Roederer, 11 F.3d at 982; see also United States v. Overstreet, 5 F.3d 295, 297 (8th Cir.1993) ("the weapons were directly connected to the drug transaction because they were accepted as partial payment for the cocaine Overstreet supplied.") (citing Smith v. United States, --- U.S. ----, ----, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993)). Mr. Graves has made no attempt to show the weapon's relation to the offense was "clearly improbable." The district court did not err in enhancing Mr. Graves' base offense level by two points for the possession of a weapon.
 
 CONCLUSION
 
 148
 Mr. Torres' allegations of error are either rejected or not properly raised in this proceeding and therefore his conviction and sentence are AFFIRMED. Messrs. Robertson's and Graves' allegations of error are rejected and their convictions and sentences AFFIRMED. Ms. Walker's conviction is VACATED and her case REMANDED for such other and further proceeding as may be just, proper and consistent with this opinion.
 
 
 
 *
 The Honorable Donald P. Lay, Senior Circuit Judge, Eighth Circuit, sitting by designation
 
 
 [1]
 Also charged in the initial indictment were Jerry Wilbourn and John Robertson. Mr. Wilbourn has not yet been apprehended and remains a fugitive, the charges against John Robertson were dismissed after the trial commenced
 
 
 [2]
 Of the eleven counts, counts 1 and 2 were for conspiracy to distribute more than fifty grams of crack and distribution of more than five grams of crack, and counts 3 through 11 were for money laundering
 
 
 [3]
 Mr. Robertson was found guilty of count 1 (conspiracy to distribute crack cocaine); count 3 (possession with intent to distribute cocaine); counts 4, 5, 6, 7, and 8 (money laundering); and was acquitted on count 2 (distribution of more than five grams of crack cocaine)
 
 
 [4]
 That count was for conspiracy to distribute more than fifty grams of crack cocaine
 
 
 [5]
 Count 1 charged conspiracy to distribute more than fifty grams of crack cocaine. The other two counts were for money laundering
 
 
 [6]
 The facts initially are set forth only in general terms. The precise facts relating to the issues on appeal are set forth, as necessary, in the body of the opinion
 
 
 [7]
 Ms. Walker also contends the government did not present sufficient evidence to sustain her conviction; it was error to deny Ms. Walker's motion to continue the trial; it was error for the district court to permit Bernadette Toney to testify; and the district court erred in its sentencing of Ms. Walker. In light of our conclusion that Ms. Walker's conviction must be reversed, these issues are rendered moot and, accordingly, we do not address them as they pertain to her
 
 
 [8]
 At least one circuit has held that compliance with the requirements of Rule 23(a) creates a presumption that the waiver is voluntary, knowing, and intelligent. United States v. Cochran, 770 F.2d 850, 851 (9th Cir.1985). However that same circuit also has joined in the apparently prevailing view that " 'a showing that the defendant's consent to waive his right to a jury trial was knowing, voluntary and intelligent is a necessary precondition to an effective Rule 23(a) jury trial waiver, one distinct from the requirement that the waiver be written.' " United States v. Ferreira-Alameda, 815 F.2d 1251, 1253 (9th Cir.1986) (quoting 8A Moore's Federal Practice p 23.03[c] (2d ed. 1984))
 
 
 [9]
 At oral argument before this court, Ms. Walker's trial counsel stated that the noncompliance with Rule 23(a) was due to the harried circumstances present as the trial date neared. It has not been suggested that this error was due to anything other than a good faith mistake on the part of counsel
 
 
 [10]
 It should be noted the motion to waive submitted on behalf of Ms. Walker did state she was "fully advised" of her right to trial by jury
 Counsel being an officer of the court, we accept counsel's representation that he "fully advised" Ms. Walker of her right to a jury trial. However, we have no way of knowing what constitutes a full advisement in the mind of counsel, and nothing in the record elucidates his subjective understanding of that phrase. If by using that phrase counsel is expressing his view that Ms. Walker knowingly, voluntarily, and intelligently waived her right, this does not alter our conclusion that nothing in the record demonstrates her waiver comports with constitutional requirements.
 
 
 [11]
 A procedural rule adopted by an individual district court judge will be referred to as an "internal rule" in order to distinguish it from a local rule, adopted by the majority of judges in a given district pursuant to Fed.R.Crim.P. 57
 
 
 [12]
 While the district court characterized its internal rule as an "interpretation" of the local rule, in truth, it is much more than that. Local Rule 40.1H requires only that written notice of the existence of plea agreement be filed with the court ten days before the Monday of the week of trial. In contrast, the district court's internal rule imposes a number of additional requirements. Most noticeably, it requires that the actual plea agreement be filed with the district court ten days before the Monday of the week of trial and also requires that a hearing on the plea agreement occur two days prior to that. Thus, a plea agreement that is reached ten days before the Monday of the week of trial could be timely under the Local Rule, whereas it could not be under the district court's internal rule. As such, the internal rule conflicts with the requirements of the local rule
 
 
 [13]
 The government additionally asserts it is "certain ... that a court can reject a plea when it does not work into the timetable of the defendant or of the court." In support, it cites United States v. Moore, 916 F.2d 1131 (6th Cir.1990); United States v. McCoy, 767 F.2d 395 (7th Cir.1985); and United States v. Pleasant, 730 F.2d 657 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984). In Moore, the court dealt with the rejection of a plea agreement in which absolutely no explanation for that rejection appeared in the record. The court observed, however, a plea that is not offered within the plea cutoff date set by the court may be justified in rejecting it. Moore, 916 F.2d at 1136 n. 11. McCoy and Pleasant both are cases in which no plea agreement had ever been entered into, let alone proffered for the district court's acceptance. McCoy, 767 F.2d at 400; Pleasant, 730 F.2d at 664. As such, none of the authority relied on by the government even remotely supports the government's assertion
 
 
 [14]
 Fed.R.Crim.P. 48(a) governs prosecutorial charging decisions and requires only that the prosecution obtain leave of court before dismissal of an indictment. While Rule 48 is not controlling in the context of a district court's acceptance or rejection of a plea agreement, see United States v. Carrigan, 778 F.2d 1454, 1462-63 (10th Cir.1985), it bears on the proper judicial role when the executive branch chooses to dismiss charges and thus, is instructive in the context of Rule 11 charge bargains. See United States v. Ammidown, 497 F.2d 615, 620 (D.C.Cir.1973)
 The prosecution's discretion to dismiss charges under Rule 48(a) is not unfettered, yet it is only very narrowly circumscribed by the judiciary's power to prohibit a dismissal. Under Rule 48(a), courts must grant prosecutors leave to dismiss charges unless dismissal is "clearly contrary to manifest public interest." Rinaldi v. United States, 434 U.S. 22, 30, 98 S.Ct. 81, 86, 54 L.Ed.2d 207 (1977) (per curiam). Thus, while district court's are granted broad discretion regarding the acceptance of plea bargains in general under Rule 11, courts are vested only with limited supervisory power over prosecutorial charging decisions specifically under Rule 48(a).
 
 
 [15]
 In fact, we note the prosecution was not required to offer any recommendation of downward departure under the plea agreement entered into. The district court expressed substantial skepticism as to whether Mr. Torres should receive any downward departure and it is due only to the diligence and recommendation of the prosecution that the district court departed downward at all
 
 
 [16]
 For instance, if a defendant were convicted of possession of crack cocaine and possession of cocaine powder, presumably the guidelines would require that each be converted to their marihuana equivalent in fixing the base offense level
 
 
 [17]
 The government's sentencing memorandum opined:
 Given the long-term marketing of crack cocaine, the large amounts of cash involved and, inter alia, the 871 grams of powder seized at 2928 Marion which would have been converted to crack, the base offense level should be 36 (500-1500 grams of cocaine base). Converting powder cocaine to crack is a simple operation according to the expert testimony at trial, so it is reasonable to assume that the 871 grams of powder would have yielded, alone, at least 500 grams of cocaine base.
 
 
 [18]
 Such a review, "guided by objective criteria," includes an assessment of "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983)
 
 
 [19]
 While the district court apparently sentenced Mr. Robertson only for his conviction on count one, the same count he was willing to plead guilty to, this does not change the fact that at no time was Mr. Robertson willing to plead guilty to all of the counts against him. In our judgment, acceptance of responsibility must pertain to the charges for which a defendant is convicted, and not with respect to the sentence imposed